May it please the Court. My name is Jeffrey Beatty. I represent Matthew Cate and David Shaw in both of these matters. I'm going to start with the older case, the older appeal, and that's the appeal based upon a discovery dispute. The Court raised the issue in an order some time ago about the collateral order or about the jurisdictional issue. We briefed that. We believe it's properly before the Court under the collateral order doctrine. Plaintiff did not oppose that, so I assume that's not an issue. But if you have any questions, I'd be happy to address them. Proceeding on. Are you still on the 07? Are you getting through with 07? I'm sorry, Your Honor. On 15-307, is that the one you just got through talking about? Yes, sir. And you say we're moving on. What happens to the attorney, assuming for a moment that the order was proper, and, however, then later on there's a different dissolution in the 90 case, what happens to the attorney fees? I'd probably have to chase them, Your Honor, because they've been paid. If the order is nullified. Suppose that the judge was correct and was not correct in doing that, and there's attorney fees, and yet he doesn't have to turn them over. I don't know the answer to that. All I know that I would do what I would do is ask for the money back and explore my alternatives if I didn't get it. I don't know what else I could do. Okay. I want to emphasize a couple of things on the Kate and Shaw appeal. As the Court knows, this is a very limited appeal on a very limited issue, a very important issue to Mr. Kate and Mr. Shaw and their roles as Inspector General and Chief Assistant Inspector General. As the Court knows, the California prison system has a lot of trouble. It's had trouble for a long time. The Office of the Inspector General was created many years ago, and there were modifications made subsequently in part because of the Madrid decision issued by Judge Stelton Henderson here in the Northern District. The OIG became a key player in monitoring the performance of the prison system, and one of the biggest difficulties that Mr. Kate and Mr. Shaw had with the document requests that are at the core of this appeal is that they asked for documents that were throughout the State, throughout an extensive period of time, regarding many, many different subjects, some not even tangentially or arguably related to his peacekeeper theory. And I note that our four categories that we focus on in this appeal include the process by which Judge Henderson and the Special Master regularly meet with the OIG, the OIG staff, and other stakeholders to hopefully make progress on some of the profound issues that unfortunately continue to exist in our prison system. Now, those are important issues. The official information privilege and deliberative process privileges were raised. We believe that they were given short shrift by the magistrate judge for a couple of reasons. Number one, the magistrate judge clearly held, notwithstanding Mr. Bess's argument to the contrary, that the privileges were waived because the responses were late. In fact, he cited the X. Rel. Burroughs case for that proposition. So it wasn't a matter of putting together two disparate portions of the order. He decided they were waived because, in large part, because of the tardiness. The record wasn't developed as to tardiness because it wasn't an issue from Mr. Bess, so we didn't raise it or develop it. Then we have the meet-and-confer issue. I'd like to point out to the Court supplemental excerpt of record pages 593 through 594, which is an e-mail string between the two lawyers. Interestingly, Mr. Plaintiff's counsel, Mr. Millaw, on 811.08, says oh, I'm sorry. My office on 811.08, attached is my meet-and-confer letter. 929, Bess responds and says, I've not heard from you since your 811 letter. And on that same day, my office responds, we're waiting for a response from you. Well, that absolutely contradicts the declaration that was considered by the district court judge in relying upon this extensive meet-and-confer. There was no meet-and-confer. It wasn't presented to the magistrate properly. And when we filed our motion for reconsideration, we get a declaration that was improper, not part of the record for the magistrate. And the district court clearly relied upon it in finding that we were dilatory. I've run out of time and will now yield to worthy counsel for the other defendants. May it please the Court, my name is Tamara Morgan, and I represent appellees Kernan, Woodford, Devey, Hickman, and Hoshino, also known as the California Department of Corrections and Rehabilitation Defendants. Key point here is that Officer Bess killed an inmate associated with a disruptive group, which resulted in a conspiracy by inmates at California State Prison Sacramento to kill him. A threat assessment was done, which confirmed these very viable threats against Officer Bess. That is why Officer Bess was transferred to Folsom State Prison, which houses less dangerous inmates. You'll find that at the record at SCR0370. Further, since the time of his transfer in March of 05, Officer Bess has suffered zero injuries by any inmates, showing that this was a good transfer to get him away from the viable threats. I refer the Court to the threat assessments. There's been four done. They are at the record at ER1704-1718, SCR475-476, SCR478-85, SCR0621-33. Moreover, there's no evidence in the record that prior to his transfer that he engaged in any protected activity. Further, even if there had been some protected activity, clearly the same action would have been taken regardless of any protected activity because, again, there are viable threats against this officer. So turning first to the Section 1983 First Amendment retaliation claim, there's no adverse actions. Here, again, it's as to individuals. He's not suing his employer, the California Department of Corrections and Rehabilitation. He's suing individuals. The transfer, as I've noted, was not for adverse – was not an adverse employment action. That's also shown by the NEDS case, NEDS v. Schindler Elevator Corporation. That's a Ninth Circuit 1997 case that said transfer with no loss of pay is not an adverse action. Officer Bess also claims that, quote, he's been repeatedly denying his – Bess's applications to be sergeant despite his great job on the interview, end quote. That's at the reply brief, page 15. And I encourage the Court to look at evidence. Here, he cites CER 1339-41. That evidence shows that he's gone for one interview at that part in the record at CSP Sacramento. There's no evidence of being repeatedly denied. Moreover, he's only been applying for sergeant positions since the earliest, spring 2008. That's well after his time of being transferred back in 2005. That's at ER 1339. And that's well after he had filed his lawsuit, well after Defendant Hickman had in 2006. Dovey had retired in January 2007. Kernan had promoted out of CSP Sacramento in 2006. And Oshino had moved to the Board of Paroles in January 2008. There are simply no adverse employment actions upon which Officer Bess can hook a Section 1983 First Amendment retaliation claim. All his requests to transfer back were done by Warden Kramer at Folsom State Prison. And each time he requested to go back, a threat assessment was done. The threat assessment found viable threat still exists. Officer Bess is still making the same benefits and same pay that he would if he was less than a mile away at CSP Sacramento. That's found in the record at SCR 344 to 345. As to the claim of not being able to get a parole agent job, quote, from the appellant's opening brief, page 33, refusing to allow Officer Bess to become a parole agent where he would have no inmate contact. First and foremost, there's no evidence that the defendants here prevented Officer Bess from becoming a parole agent. Officer Bess could go and get the education to meet the minimum qualifications. He hasn't done that. That's at SCR 397, SCR 352. It's undisputed that Officer Bess hasn't taken a civil service exam to be a parole agent. That's at SCR 352. It's undisputed that he's never applied to be a parole agent. That's at SCR 344. It's also undisputed that when he had asked Officer or rather Warden Kernan where he'd like to go after he had shot and killed the inmate, he said he'd like to go to paroles. Kernan did his due diligence and tried to see if he could get him into a parole agent position by having him speak to Woodford and Devey. There was a meeting on January 4th, and the purpose of the meeting was for Officer Bess to put forward why he felt he would be safer. At that time, Woodford and Devey said we need to have a threat assessment. A threat assessment was conducted, and Woodford did not feel that he would be any safer on the street than he would be in an institution. Moreover, Woodford had Devey look into seeing if there was any parole agent positions in the area even open, and there wasn't. That's at ER 1753 and 1760. Kagan, can I ask you a question because the time is rolling by? And you have an appeal? We are the appellees. We had won the motion for summary judgment. But you're arguing as an appellee? Correct. We were instructed that we each had 15 minutes of time in total and that the cases were combined to address. Well, the appellant should have argued first. Yes, so we're backwards. That's right. We get the argument, so we're fine. Okay. Maybe you better reserve some time. Let me go ahead and reserve the rest of our time. Thank you. It's very confusing. May it please the Court. Good morning, Your Honors. My name is Jeremy McLaughlin. I'm here on behalf of Officer Best, and I'll be presenting the argument in the summary judgment appeal. With me is my colleague, Mr. Brooks Beard, and he'll be arguing the privilege waiver appeal, and also in the courtroom we have with us Officer Best today. I plan to argue for the first 10 minutes of our time, and then Mr. Brooks will address the privilege waiver appeal from the OIG defendants. Your Honors, this case is about the illegal use of peacekeepers in California prisons and the acts of senior officials in the Department of Corrections and the Office of the Inspector General, the defendants in this case, to cover up that use at the expense of the safety of their employee. I would like to focus on two related points. First, the district court erred by failing to apply appropriately the summary judgment standard in this case. Officer Best was the nonmoving party, and the district court should have viewed the facts in the light most favorable to him, and any genuine issues of material facts should have been resolved by a jury rather than under the district court's view. And second, the district court abused its discretion in striking Anna Ramirez Palmer's declaration and in disregarding her expert report. Turning to the first point, a good example of the erroneous application of the standard of the summary judgment standard relates to Officer Best's transfer to Folsom State Prison. This Court said in Allen that just because someone could have been transferred for a legitimate reason does not mean that they were. That's a question of fact that is inappropriate for resolution at summary judgment. Here, the defendants argue that the transfer was for safety. However, there is a genuine issue of material fact about whether safety was a pretext. And nevertheless, in light of that evidence, the district court said he looked at the evidence and concluded, quote, it makes perfect sense to me to get him out of CSP Sacramento, end quote, and ended it there. This was error because there is more than enough evidence for a reasonable jury to conclude that safety was purely a pretext. After the shooting at CSP Sacramento, Officer Best was placed in a minimum security area supervising low-risk inmates outside of the main yard. If safety were the true concern of the defendants, that would have been fulfilled here. Nonetheless, months later, Officer Best was transferred to Folsom. Folsom is an older prison and it is much less safe. Officer Best was placed in the main yard. At Folsom, there is only one yard that houses all of the inmates. There are more blind spots. There are less correctional officers there. In fact, Warden Kernan had knowledge that Folsom was not as safe as a prison. Prior to the transfer, Officer Best and his attorney, Mr. Caden, a former warden himself, met with Warden Kernan and explained to him the safety threats that would be present once Officer Best was transferred because of the conditions of Folsom State Prison. Nonetheless, the transfer occurred. In addition, as the defendants point out, there are pending threats against Officer Best. Our expert testified that inmates transfer back and forth regularly between CSP Sacramento and Folsom State Prison. If there were a hit put out on Officer Best at CSP Sacramento, it could take a matter of days for an inmate to transfer within those two prisons and relay that hit to the main yard where Officer Best was stationed upon his transfer. In addition, even further pointing this out, Officer Best testified in April of 2005 he was subject to a high-speed car chase outside of prisons. From this, a reasonable jury could have inferred that if a threat on Officer Best's life made its way outside of the prison walls, it's even more reasonable to conclude that it could transfer simply from one prison to another. And finally, compounding the harm that this transfer put upon Mr. Best is that the defendants refused to provide Officer Best with the threat assessments that were being conducted. Without those threat assessments, Officer Best could not understand the threats that were out against him. He didn't know how to protect himself or his family from those. In fact, Your Honors, in looking at all of these, at a totality of the circumstances, which is what the district court was required to do, it clearly undermines the defendant's argument that the pure reason for the transfer was safety. And it can be summed up, actually, with one interaction. Throughout this entire time, Officer Best has been applying to transfer back to CSP Sacramento. Those requests have been convinced. that the transfer was done because of retaliation. I mean, it may have been an erroneous transfer. Maybe it's an improper transfer. Maybe it should have been done some other way. But you're charging retaliation. Where's the evidence that there's a retaliation? I have several responses, Your Honor. First, the evidence is that to demonstrate that the officer, that they retaliated because of his speech, to show that there's a substantial motivating factor, that can be demonstrated in a number of ways. One, the pretextual ways that I just laid out, which undermines their argument. Second, the temporal proximity of the transfer. Officer Best, a month or two after the shooting, had confronted Warden Kernan about the use of peacekeepers, or excuse me, about the use of peacekeepers and about inmate Tigger, the one that ordered the hit that caused the shooting, about the extremely high numbers of confidentials placed in his file. So Officer Best had already started to raise awareness here. Within a very short time after that, he was transferred. And so that combined, Your Honor, with our experts' testimony, that looking at all of these acts combined by the defendants, and including the repeated refusal to allow Officer Best to transfer back to CSP Sacramento. And at one time, Warden Kernan. That is consistent with his being transferred because of his own safety. I agree, Your Honor, with the exception that, as our expert testified, for one of the transfers, whenever Warden Kramer, the warden at Folsom, denied it, Warden Kernan instructed Warden Kramer to, quote, make something up, end quote, in order to deny the request back. That undermines the true concern here with safety. And so the -- Was that directed to this instance or just a general statement that he made? It was directed to denial of a specific request to transfer back. Officer Best has had many requests to transfer back throughout the litigation or throughout the time frame here. And so, Your Honor, if I may, that the transfer pretext was just an example that I wanted to point out to the Court of the district court failing to let the jury decide issues of genuine material fact and deciding them under his view of the case. For my remaining time, I would like to turn to the second point, which is related to the first point, and it was that the abuse of discretion the district court had in not only striking Anna Ramirez Palmer's declaration, but failing to give it any weight. At one point, the district court said, quote, there's no evidence, again, unless I find and give appropriate weight to the so-called plaintiff's expert, and I don't, obviously. I give little weight, if any, to her testimony, end quote. And that's at ER 152. But under Federal Rule of Evidence 702, her testimony was admissible and also very important, because it would have helped the ultimate trier of facts, which is the paramount concern of the rule. Under this Court's recent decision in Primiano v. Cook, once the expert evidence is admissible, it should be up to the jury, not the Court, to decide what weight to give that testimony. Here, Ms. Ramirez Palmer is a 25-year veteran of CDC. She served in positions such as correctional manager. She was a warden at two institutions. She was the northern administrator overseeing wardens in 12 northern California prisons. Her report and declaration applied her specialized knowledge, which is what is required under Rule 702, to the facts of this case, to help the fact-finders identify what these facts mean in the highly unique atmosphere of CDC and within CDC management. This falls squarely within the rule. CDC is a very unique place, and its processes are very unique. In fact, CDC has relied on that. And this Court before in the Freitag case. And the jurors would be unfamiliar looking at the facts of this case. They would be unfamiliar with what, looking at them as a totality, what does it mean in the context of this highly specialized area. That is what Ms. Ramirez Palmer provided in her expert report. And by disregarding that and striking the declaration, the district court abused its discretion. And if there are no further questions, I want to turn it to the microphone. The question about a Rule 26a problem with the expert. I'm sorry. One more time, Your Honor. Was there a problem with 26a, the report of the expert? Yes. Exceeding the report, so it's inadmissible? There were objections. And that is one of the grounds, yes, that the judge sustained it on. But we believe that the district court judge abused his discretion in doing so. For example, paragraph 27 of her declaration, which is one of the declarations that he said was a new opinion, that discussed the possibility of transferring to the parole division without meeting the minimum qualifications. This was spoken to directly in Anna Ramirez Palmer's deposition. She said, quote, in a lateral transfer, you don't have to meet the minimum qualifications. You only have to meet the salary criteria. Somebody going to talk about the protected speech allegations? I'm happy to address those, Your Honor. You're not going to talk about them? I'm prepared to discuss them. I'd like to know, in his protected speech, if he has, some of it was protected speech, what evidence is there that any of the defendants knew of the protected speech at the time of the transfer? So Officer Bess was transferred in March of 2005. In January of 2005, Officer Bess had confronted Warden Kernan about the failure to properly deal with inmate Tigger. As our expert testified, there are weekly meetings among prison administration, and the very nature of the issue in this case, an inmate shooting, a threat on an officer's life, those would have gone to the highest levels of the administration. The defendants would have all been aware of what actions occurred during the shooting, but also Officer Bess's allegations against them and what actions were being taken against Officer Bess as a result of that. If there are no further questions, I'll now turn it to Mr. Beard. Thank you, Your Honors. Opposing counsel hit it right on the head with his opening statement to the Court. On the privilege issue, it is just that it's a discovery dispute. The purpose of OIG is not at issue. The document requests and the scope of those requests are not at issue. Burlington Northern, this Court's Burlington Northern decision is what controls here. The conduct is that of the discovery issues. The magistrate judge referred to the conduct as, quote, a scorched earth approach to pretrial discovery in disregard of their obligations, entirely conclusory, wrong, outrageous, dilatory, and verging on contempt. In addition, focusing on the Burlington Northern issue, the OIG defendants failed to ever provide a privilege log to support their privilege claims. In addition to overruling all the objections that the OIG defendants had imposed in response to the document requests, they failed to provide a privilege log. As a result, in looking at the Burlington Northern decision, it was appropriate for the magistrate judge and ultimately the district court judge to find that all privilege had been waived. I also want to point out that in the SER 593, this is on the meet-and-confer issue, opposing counsel discussed the e-mail between counsel. He disregards that there is additional information in the record about the efforts by my co-counsel at the time to make communication with opposing counsel on the discovery issues. But most importantly, at SER 593 at the top in the e-mail from OIG defendants, he says, quote, the joint letter is probably the best way to proceed with the issue, end quote. Moreover, neither the magistrate judge nor the district judge were concerned or even suggested that plaintiffs had failed to comply with their meet-and-confer obligations. Sotomayor, the privilege documents, does the Mohawk case have any application? The Mohawk case, Your Honor, is the recent Supreme Court decision, and I think it would have if we hadn't gotten past the stage of summary judgment. I think at the time that the appeal was filed, yes. Unfortunately, the Supreme Court ruled that it's not necessarily so that a privilege waiver is appropriate for an intermediate appeal prior to resolution. This is not an – we're not an interlocutory anymore, is that right? Or are we? While that – while that, yes. So remember that there's two appeals that were filed, and that was also the confusion about who went first. Yeah. When the appeal was filed, the case was still proceeding. However, we're now at the stage where summary judgment has been granted. The case is over based upon the district court's ruling. Well, let me – let me see if I can put it a different way. Your position is that when it was filed, the case was in – we lacked jurisdiction over it because it was an interlocutory order. Now that final judgment has been rendered in the underlying case and all the orders merge in the final judgment, you believe we have jurisdiction? Is that – does that summarize your position? Yes, Your Honor. Okay. And if there's no further questions, we'll rest there. Your Honor's asked about protected speech. The only statement that was done before the transfer in March of 2005 is from Officer Bess to Warden Kernan, and that is not protected speech under Garcetti or Hubbert or under Freetag, for that matter. It was from Officer Bess to within his chain of command. There is no protected speech that occurs prior to the transfer. Further, as to Ramirez-Palmer's declaration, the judge was very clear in this, that he stated, quote, In short, this declaration and the court finds it to be conclusory, devoid of specificity. She attempts to create a fact from an opinion rather than render an opinion from fact. That's at ER0095. Rules of Evidence, Rule 702, states that you have to have facts upon which you base your opinion. She doesn't have that, and that is in part why he struck the declaration. He also struck it because it violated the status order that said no new opinions after the report and after the opportunity to depose. Moreover, as to her report, the declaration was stricken. As to her report, her opinions are not, again, based on fact either. She cites the evidence, but the evidence actually isn't there. If you look at the evidence, for example, with regard to the FBI, the FBI declared at SCR656 and the U.S. Attorney's Office at 664 to 665 that there was no investigation into the use of peacekeepers, yet she claims there was an ongoing investigation. On behalf of the defendants, we request that you affirm the decision. Thank you. Okay. Thank you. The case matter just argued is submitted for decision. Okay. We'll hear the last case for argument, which is Game Tech International v. Trend Gaming Systems. Let's wait just a moment until we're all set up. I'll get myself set up in a glass of water. Okay. Now who's sitting where? Okay. May I begin? Good morning. May it please the Court. My name is Richard Chambliss. I represent the appellant, Trend Gaming Systems. I'd like to keep your voice up. I'm sorry. My name is Richard Chambliss. I represent the appellant, Trend Gaming Systems. I'd like to reserve three minutes for rebuttal. And you've heard the line, but you have to keep track of your own time because we don't subtract any points. I see it right there. So I'll look for 12 minutes and shut up. This case has multiple issues that are before the Court, and I'd be happy to address any one of them that any one of you have particular interest in. Otherwise, I'm going to run through three or four of them and see if questions arise. This case involves the right of Trend Gaming to its personal property. And what has occurred at the trial court level is prior to a final judgment being entered, there was a preliminary injunction in effect that had been in effect for some eight years. Ultimately, what it encompassed is some $650,000 worth of restricted funds. The basis of the preliminary injunction was a claim by GameTech that it had a right to proceeds Trend Gaming received from Trend Gaming's customers under either a theory of conversion. In the second trial in this matter in 2009, Magistrate Judge Voss had granted directed verdicts on both the conversion and the unjust enrichment issue, essentially then rendering that GameTech had no further claim or right to Trend Gaming's personal property. In short, the issue in the case is, who owns the funds in the trust? Is that it? That's one of the issues. I think there's two issues there. Is it the creditor's money? Say that one more time, Judge, excuse me. The money in the trust, to whom does that belong to? Is that the issue of the case? That's one of the primary issues in the case. And during the eight years of litigation, while the preliminary injunction was in place, what the trial court was saying is, they don't know who has the right to the money. It was Trend Gaming's money collected from Trend Gaming's customers, but subject to the claim, I guess let me break it down in three ways. I'm trying to get at what the issue of the case is. You've got money in the trust, right? You have money in the trust. Under a restraining order. Under a preliminary injunction. All right. Preliminary injunction. The injunction is dissolved, right? The injunction is dissolved upon entry of the order in November. The injunction is dissolved. Correct. Who owns the money in the trust? Is that the issue? The trust owns the money, or does the creditor own the money? Well, the money is being held by the bank as trustee pursuant to the constructive trust. There's a corpus in the trust. Who owns the corpus in the trust? Trend Gaming Systems owned the money in the trust from day one, subject to the court saying we're going to put your money in a restricted account because if Game Tech prevails on conversion or unjust enrichment, they have a right to this preliminary injunction. That's your theory, that it was solely for the – on the conversion or unjust enrichment, and when those were dismissed, the money should have been depleted. No, excuse me, Your Honor. That's not my theory. That is the status of the case. Well, no. That is your theory. Because the alternate theory is that the district court knew what it was doing and thought that its order was broader than how you interpret it. Because if it agreed with you, it would never have ordered the dispersal. True? Yeah. Well, I think we're talking two different – we're talking two different issues. I'm addressing the issue of who owns the money. And when I – when you say that's my theory with respect to unjust enrichment or conversion, that's the state of the record. Well, let me ask this. There's been a final judgment. This is procedurally we're trying to get a handle on. Yes, Your Honor. There's been a final judgment. Yes. Has there not? And that judgment was entered in favor of Game Tech, is that correct? Yes, Your Honor. Okay. And that was in amount of what, damages? That was damages for two different claims, call it $800,000 in round numbers. And the money that was in the trust has been dispersed? Subsequent to the entry of the final judgment, Game Tech applied for the release of the funds. Trend Gaming filed a cross motion for the release of the funds. And ultimately, Magistrate Judge Voss entered an order releasing those funds to Game Tech. So the funds have been released to Game Tech. Now, what you want now is, since Game Tech had the – has a judgment in its favor and that was – they were – it was released in satisfaction of the judgment, I would – Well, I guess it would be released in partial satisfaction of the judgment. The question that's presented by Magistrate Judge Anderson – excuse me, Magistrate Judge Voss's rulings are, at the time he entered the ruling releasing the corpus, the preliminary injunction proceeds to Game Tech, Game Tech had a money judgment and a money judgment only. They had no right to that money unless they properly applied for it. Well, but normally, if you hold money in trust, pending the outcome of the litigation, constructive trust, and that's in order to satisfy a judgment, so the – in the event that the plaintiff prevails. And that's what happened here, and that's what the judge thought he was doing, was dispersing the funds in partial satisfaction of the judgment. And what is the remedy that you seek now? Because the issue is not who does the trust belong to, because the trust is – the funds aren't in the trust anymore. The issue is whether Judge – Magistrate Judge Voss correctly ruled releasing the monies to Game Tech is true. Well, but I asked you what remedy you want. The remedy that we're asking this Court is to enter an order finding that Judge Voss directed Game Tech to place the $650,000 it received pursuant to Magistrate Voss's order back with the clerk of the court. The monies have improperly been released. But they still – you still owe them $800,000. Trend Gaming owes Game Tech a sizable amount of money. However, those monies, at least $470,000 of those, are subject to a perfected security interest. Well, let's assume a different circumstance. Let's say there's just a judgment in the case that nothing – no constructive trust had ever been entered, and that after a judgment was entered, they executed on the bank account. Let's say you had the bank account there. What's different? If they would have properly executed on the bank account, then they would have the right to do that. If they had a money judgment and they filed a writ of execution and got a writ that was directed to the bank account, okay. Well, they do have a money judgment that you aren't appealing. Excuse me, Your Honor, but for one thing, in the – from the period of time before they got their money judgment, if the money would have been sitting in a bank account that's Trend Gaming's bank account, they got $650,000 sitting in an account that they have the right to disperse as they see fit but for the preliminary injunction, the case law is clear that Trend Gaming can prefer one creditor over another, and Trend Gaming did so. So the security interest that you're talking about is what? Free fees? The security interest is for fees due and owing of $469,000 and some change. Attorneys' fees to you? Attorneys' fees to my law firm for representing Trend Gaming from 2004 through today. And that's what this is about. If you find that there's a factual issue, then you can remand to the judge. The judge had the issue before him. Magistrate Judge Vos had the issue before him in the competing motions to release funds. He's already decided in favor of GameTech, right? Decided wrongly in favor of GameTech over the rights of a secured creditor when there was no proper process that was followed to execute upon those funds. But you're talking about the dissolving of the trust. I'm saying two separate things. Not the judgment in favor of GameTech on the merits. Correct. Trend Gaming has not appealed the ruling in favor of GameTech on the merits. What Trend Gaming has appealed is the ruling by Judge Vos over the rights of a secured creditor after the preliminary injunction had expired, faced with the competing interests of GameTech, a judgment creditor, and Brony Noberg as a secured creditor, which one has the right to the money. Now, I've got two questions, if you'll bear with me. First, it's hard for me — well, I'm not sure that the preliminary injunction was dissolved by the order, dispersal order. And if not, then it seems to me we don't have appellate jurisdiction over this question. And let me explain my reasoning, because I want to give you a chance to point out where I'm mistaken. The preliminary injunction enjoined your client or forced your client to place money into the account and to maintain it there. In the order granting the motion for directing the bank, it says to release the funds in the bank. There is no language I see in the order that dissolves the preliminary injunction. And I assume that had you continued to collect money up until the point of judgment, you would have to put it in the account. The preliminary injunction was still in effect. And the wording of the preliminary injunction says it continues until further order of the court or until final judgment. So given that the order is a dispersal order and not one that dissolves the preliminary injunction, if that's true, how do we have jurisdiction over your appeal? Okay. I think there's two questions there, Your Honor. The first, let me — at least I see two questions. I wanted to give you my whole spiel first so you could respond. Okay. Well, now I'm going to forget the first one. The preliminary injunction expired when the judgment was entered in November, which was the final judgment of the case. Following the entry of the final judgment, there then was a motion to — filed by Game Tech to say, hey, wait, we've got to put some prejudgment interest in here. Let's amend the final judgment. That amended final judgment entered in January. And then it's not until February that the court decides who has the right to the money. It's not simply a dispersal order like the Ornamental Iron case was, where there was already a determination, this money is going to be paid to this entity. It was attorney's fees in Ornamental Orange. This money is going to be paid to the lawyer who's withdrawing, and you guys go fight. And a couple of months later in Ornamental Orange, the parties reached a resolution and then subsequently there was an order entered, disperse the money. In our case, in January, in November, when the judgment was entered, there was no order of dispersal, but upon the entry of a final judgment, the preliminary injunction expired. It was of no further effect. And we have cited it based on the effect. Your argument is it wasn't the dispersal order that terminated the preliminary injunction, it was the entry of the final judgment. Yes, Your Honor. That answers the first question. And the second question is? But then there was a judgment entered after that? There was an amended judgment that entered one in November, one in January. There was still no ---- there's $650,000 sitting in an account that we ---- has not been determined who owns it or who has the right to it as of either the November order or the January order. It wasn't until February when there were ---- had been competing motions filed, GameTek saying give me the money, Judge Vos, Trend Gaming and its counsel saying no, we have a security interest, preliminary injunctions expired. Trend has the right to the money, not to GameTek. Judge make a decision about that. He made that decision in March. If everything had been decided, how would Trend Gaming contest the decision made in March, which wasn't just a dispersal order, it said this party is entitled to the money when there were competing claims as to who was entitled to the money. Okay. So it was more than a dispersal order. Does that answer your question, Judge? That's my first question. The second question is how does your client have any standing to assert the rights between two secured creditors, arguably secured creditors? I'm going to answer that. The position, as I understand it, is that your client had the right to control the money. It gave a security interest to your law firm. And we have a competing constructive trust interest. So how does Trend have any cognizable interest left in this case, in the funds? Trend has an interest in the funds because when the preliminary injunction expired upon the entry of the final order in November, there was no further, there should be no further restriction on Trend's money. Trend then gave a perfected security interest, which it was entitled to do, prefer one creditor over another. And Trend had the right for the additional $250,000 of the 650. Excuse me, the additional $200,000. GameTech did not apply for or seek any properly recognized enforcement mechanism to seek that money. They simply said, Judge, give it to me. Release this to me. However, the preliminary injunction had already expired. I've got 11 seconds. Have I answered your question, Your Honor? Yes, I understand. I think we should hear from them. I appreciate it. Good morning. My name is Robert Mandel, and I'm from Phoenix, Arizona. And I represent GameTech International. I would like to address two issues this morning, beginning with the threshold issue of appellate jurisdiction that GameTech has raised in its answering brief, which we've heard a little bit about this morning, followed by the propriety of the trial court's judgment enforcement order of February 19, 2010. But as a parenthetical, I'll simply note, and I gather you've already gathered, that you are the seventh, eighth, and ninth judges of the federal judiciary over the 10-year pendency of this action to grapple with Trend's efforts at any cost to ensure that these restricted funds would never enter the pocket of GameTech International. And by way of further digression, you are the 13th, 14th, and 15th judges of the federal judiciary over that period to deal with the aftermath of Trend's efforts in 2002 to put GameTech International out of business. I think that provides a useful backdrop to all of the issues we're dealing with here today. Trend's appeal of the trial court's judgment enforcement order of February 19, 2010 presents a dispositive question of appellate jurisdiction. If this panel concludes as it should that the judgment enforcement order is not appealable as a final order or as an interlocutory injunction order, you need not wrestle with the labyrinth of civil procedure questions that Trend always raises. So how do you deal with the argument that it merged into the final judgment? Yes. Your Honor, just to clarify, how do we – the question is, how do we deal with which order merged into the final judgment? I'm talking about the order directing the release of funds. Yes. The final judgment had already been entered. Right. But there's an amended judgment later. Correct. And the order dispersing the funds was more than a month after that. So it's a post-judgment dispersal order, precisely of the kind that this Court has defined in the – in the case that we cite throughout our brief. Ironworks. What's that? Ironworks. Correct. In Ironworks. It's a classic ministerial order. If this Court – if all post-trial order – post-judgment orders of that sort were deemed to be final orders and appealable, this Court would be inundated with all manner of post-judgment orders on appeal. That's not the intent or judicial policy. Let me ask you this. If this order – this is – you're talking about the order that is under review here or sought to be reviewed here.  Is that the February 19th order? That is the order they appealed. Yeah. That's the order directing all the funds in the trust to be dispersed again, technically? That's correct. Okay. And the final judgment was more than a month earlier, January 7th, 2010. That's correct. Now, was there ever any – how did the – did the district court ever rule on an objection to the February 19th order that – that said that the – releasing the funds to Game Tech, or was there a – There was no proceedings post-February 19th wherein Trend objected, sought reconsideration, or otherwise attempted to seek review at the trial court level of the judgment enforcement order releasing those funds to Game Tech. Then how was this issue raised before the district court? The issue was raised – the way that this happened, Your Honor, to digress into a little procedural history, and I'll try to stay away from too much of it because my time is limited as well. But what had happened was that in the course – on the very last day of trial, during Game Tech's oral motion for judgment as a matter of law, just as the jury had been sent out to deliberate, Trend – Trend's counsel stood up and moved the court to declare the constructive trust dissolved and to further find that it, therefore, was entitled – had a property right in the funds that – the restricted funds in the constructive trust. The judge, having heard opposing counsel say, it's not our intent to go out and take this money, concluded that he would not resolve the issue, would not declare the constructive trust dissolved until he had an opportunity to fully adjudicate the issue on written briefs, written motions. The expectation at that time was that we were going to get something from Trend in the way of a bench memorandum within 24 or 48 hours. The judge said, you know what? I expect this issue really is going to be resolved at the time the jury comes back with their verdict. And what he meant by that was that if the verdict came down against Game Tech, then there really wouldn't be a question that the funds would go to Trend. And if the money came – if the – if the money, excuse me – if the judgment came down for Trend, for Game Tech, then the issue of who had an ownership interest in those funds, the restricted funds, would become moot or academic, because at that point Game Tech would be a judgment creditor entitled to exercise its rights under Federal Civil Procedure 69 on any funds that were available, any assets that were available within the Court's jurisdiction, which is precisely how we believe the Court saw it. Okay. Now, let me ask you this. If I understand the argument in the briefs, at least, that Trend is making, it is that the constructive trust was imposed only on the conversion and unjust enrichment claims, which are equitable claims, and that the – those claims were dismissed and, therefore, the final – the trust ended. Right. Now, why were – is it correct that those claims were dismissed, and why were they – why were the equitable claims dismissed? The claims were dismissed on judgment as a matter of law for reasons that I have yet to be able to articulate in my own mind, because it is not. What doesn't matter, they were dismissed. It doesn't. And that's essentially the point. It doesn't matter that they were dismissed because – No, I mean, the rationale doesn't matter, but they were dismissed. They were dismissed. They were indeed dismissed. I mean, Trend's whole argument is you trace the funds to the dismissal of those claims, and, therefore, that's the end of the – that's the end of the day. And even if – and our response to that is even if the constructive trust did dissolve upon either the dismissal of those claims or the entry of the invalid final judgment on November 17th or the entry of the valid final judgment on January 7th or sometime thereafter, it doesn't matter because at that point, GameTech was a judgment creditor with the right to execute on any assets that were available to it at that time. Well, it does matter because you have a competing security interest. The security interest is entirely invalid, Your Honor. Well, yeah, but we're not – that's a separate issue. You're saying you have an unfettered right to execute on the funds. That's a question for another day, if the funds have to be restored. Well, let me nevertheless address the issue of the security interest because I think that it's an important one and it certainly is embraced by most of their briefing. They rely almost entirely on California law from 1996, at which time the Uniform Fraudulent Transfer Act in California omitted the 11 badges of fraud, the 11 badges of actual intent to defraud that the Arizona UFTA includes. And therefore, at the time that the court in the – I think it's the Wiser decision permitted a judgment debtor to prefer another creditor to the judgment creditor, it wasn't dealing with the same statute that we have in Arizona. So California law is completely irrelevant on the issue of whether or not Trent had the right to prefer a creditor, its own attorneys, over Game Tech and its judgment. Arizona law is completely different. Arizona law says it's not the transaction that we look to to determine if there's actual intent to defraud or impede. We look to the intent. We look to the intent. We look to the evidence that there was intent to defraud a party. And here that evidence is overwhelming. In fact, we meet at least four of the badges of fraud under the UFTA. And what's important because there's no judgment on fraudulent transfer here. I mean, that's absolutely correct. I understand it. Yes. Although I will say that we made those charges in our papers below. Right. And they were not refuted. In other words, Trent has never stated, suggested, or argued that they did not have an intent to defraud Game Tech. Well, we don't, we can't. Can't solve all your problems. Right. So let me go back again. Yes. The argument that the point that once the conversion and unjust enrichment claims were dismissed, then the trust was ended and the money should revert to trend. That was really, that was raised not until after the, that was raised orally. Correct. And it was never actually formally before the Court. What is your position with respect to whether we have a record on that that can decide the point? Yes. Well, what we have about it is what's in the transcript of the November 6th hearing. And what the judge said was, I hear your motion, trend. However, I am not going to rule on that motion. Now, it is not even before me. Well, he just said, oh, I want your motion in writing, didn't he? Yes. That's the way I said it. He said, I want your motion in writing, at which time I will rule on whether the constructive trust is dissolved. And if I understand, it never was. That's correct. He never made a formal ruling on whether the constructive trust was dissolved. In your view, is this issue before us to decide or not? On this issue of whether he made a formal ruling? No. Whether or not once the equitable claims for constructive trust and just enrichment were dismissed, that the constructive trust had to be dissolved and the monies returned. I think it is, and I think that the answer is no, because what the judge, the net effect of the judge's bench decree on November 6th was that the constructive trust would continue until he decided otherwise. And all of this mishugas that took place with respect to granting a security interest and all of the rest took place during the pendency of that order that continued the constructive trust in effect. Well, constructive trust dissolved on the entry of final. I'm sorry. Yeah, the preliminary injunction dissolved on the entry of final judgment. Well, that is their position. I don't read the law on that issue the same way. No, that's under the terms of the preliminary injunction. Or upon further order of the court. Right. That's the language. And our argument is that on November 6th, it was a further order of the court that the judgment that the constructive trust was not dissolved until the court ultimately decided that issue on a written motion that didn't come for months later, after the verdict had come down, after GameTech had become a judgment creditor, and after GameTech did nothing more than exercise its rights under Rule 69 of the Arizona law. Excuse me. That's a strange reading of the preliminary injunction order. In what sense, Your Honor? Because it says on final judgment or further order. It doesn't say, well, final judgment doesn't count. Final judgment happened. The preliminary injunction dissolved. Now, what happened at that point? I don't know. I mean, it's a – but if your case is dependent on the continuation of the constructive trust past that point, then. Well, the money is still there in the trust. I assume the money isn't still being paid into it. Well, the money is long gone, Your Honor. No, I don't mean that. I mean, at the time. At the time. At the time. Correct. The money was being held by the trustees, and the trustees were faced with an order that simply said to them, you may never release this money unless you have an order from the court. I mean, in pure security interest terms. And the question is whether or not the constructive trust at that point had priority over the security interest. And your position is it was a fraudulent transfer. Theirs is it's a valid security interest. More than that, it was a fraudulent transfer. It was also a violation of the orders, the contempt of the November 6th order, a whole variety of problems with it. And let's not examine this issue out of the context that all of what you're – all of what you're seeing today in the context of this appeal happened before. This is the second time there was a fraudulent transfer. They were adjudicated by a jury to have done it before. They were doing it. But context does matter because the issue of intent is so germane. Right. But we can't – we can't adjudicate intent based on your oral argument today without some defining the district court. I mean, that's – you can't do that. I may have a perfectly good position on that, but I don't see how we get to it today. Very well, Your Honor. Then let me conclude by simply stating that we believe that we had a right to execute on our judgment and that the issue of ownership and the existence of the constructive trust became irrelevant at least as late as January 7th, 2010. Thank you, Your Honor. Thank you. Are we done? Or do you have – is there – I think you've got a minute left. I had about 13 seconds left, I think. Let me ask you just one question, and with your indulgence. I know we need to get out of here. Normally, if a creditor executes on a judgment pre- and didn't stay the transfer of funds, it's moved on appeal. It's hard for me to see how that's any different here. I mean, the funds have been released. What effective remedy can we impose now? If the funds have been released improperly in violation of the perfected secured interest holder, then Judge Vos abused his discretion. He should issue an order directing GameTac to return the money. I know what you want, but what's the case law that would allow us to do that? Isn't it another lawsuit? Yeah. Another lawsuit, I suppose. Well, I don't – I can't hand you a case right now that says that, Judge. I don't know that. Okay. Thank you. Thank you. All right. The case just argued is submitted. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Conti, Schroeder, Thomas